# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **CARL C. CHESHIRE** | **CIVIL ACTION NO. 3:15-0933** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **AIR METHODS CORP** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

Plaintiff Carl Cheshire ("Cheshire") has sued Defendant Air Methods Corp. ("AMC") for alleged violations of the Louisiana Whistleblower Statute ("LWS"), LA. REV. STAT. § 23:967, *et seq.*

Pending before the Court are cross motions for summary judgment. [Doc. Nos. 130, 131]. Also pending before the Court is AMC's Motion to Strike Cheshire's affidavit. [Doc. No. 136]. For the following reasons, AMC's Motion to Strike is GRANTED, AMC's Motion for Summary Judgment is GRANTED, and Cheshire's Motion for Summary Judgment is DENIED.

## I. FACTS AND PROCEDURAL HISTORY[1]

### A. Background and Cheshire's Alleged Deviation from Protocol

AMC provides medical transportation services, primarily through the use of helicopters. Cheshire began working for AMC as a full-time helicopter pilot on April 16, 2012.

Pafford Emergency Medical Services, Inc. ("Pafford") is an ambulance company that has an

---

[1] The Federal Rules of Civil Procedure require "[a] party asserting that a fact...is genuinely disputed" to "support the assertion by...citing to *particular* parts of materials in the record" and by "showing that the materials cited do not establish the absence of a genuine dispute." FED. R. CIV. P. 56(c)(1) (emphasis added). On multiple occasions, Cheshire fails to support his assertions with any citation to the record. More often, he cites entire depositions and expert reports. Although under no duty to wade through copious amounts of documents to find support for Cheshire's assertions, the Court has attempted to locate supporting evidence.

emergency air medical transportation program. In March 2013, AMC and Pafford entered into a helicopter services agreement. The agreement allows AMC to provide aviation management, maintenance, and pilot services to Pafford in exchange for payment from Pafford. Pafford provides the in-flight emergency medical services in connection with the agreement.

AMC pilots are responsible for reporting any perceived issues with aircrafts. After noticing an issue, the pilot is expected to write up a maintenance report and ground the aircraft.

Upon starting the aircraft, a pilot can experience a "hot start," meaning that the temperature of the engine exceeds a predetermined level. The turbine outlet temperature light ("TOT light") illuminates when this happens. On December 24, 2013, Cheshire reported a hot start through maintenance, but did not report it to AMC through its electronic AIDMOR system as required by company policy.[2] [Doc. No. 131-1, Cheshire Depo, p. 142].

On January 3, 2014, AMC claims that Cheshire made a precautionary landing due to a progressive loss of electrical systems. AMC conducted an investigation into the landing and determined that the pilot on the shift before Cheshire failed to report a generator fail light had burned out. It was also determined that Cheshire had not followed his checklist to determine that the generator fail light was inoperative. The battery went dead in flight, forcing Cheshire to make the precautionary landing.

On January 31, 2014, Cheshire was the pilot of a 15-minute flight from LSU hospital in downtown Shreveport, Louisiana to an airfield in Minden, Louisiana. Cheshire advised the crew that the low fuel light would come on during flight. When the low fuel light illuminates, it indicates that

---

[2]All pilots were expected to report safety events through AIMDOR within 24 hours of the event.

the aircraft has, at most, 16.5 minutes of fuel on board. The Federal Aviation Administration ("FAA") requires that a pilot plan for there to be a 20-minute fuel reserve upon landing. AMC went beyond this requirement and mandated a 30-minute fuel reserve. Despite the existence of an airport in downtown Shreveport where he could have refueled the plane, Cheshire flew to the Minden airport without refueling. [Doc. No. 131-8, Worthington Declaration, p. 3]. According to AMC, upon landing, the aircraft had 8-12 minutes of fuel remaining. *Id.*

On February 3, 2014, Cheshire's supervisor, Dennis Worthington ("Worthington"), learned of the low fuel incident. Worthington believed Cheshire should be placed on administrative leave pending an investigation into the incident.

AMC claims that, after the investigation, it determined Cheshire's actions in connection with the low fuel incident were a major safety violation because they were intentional. [Doc. No. 131-8, Worthington Declaration, p. 4]. Worthington and Scott Tish ("Tish") made the decision to terminate Cheshire's employment; however, it is unclear whether Cheshire resigned before AMC terminated him. *Id.*

Despite voluminous record evidence to the contrary, Cheshire disputes that AMC conducted an investigation into his alleged wrongdoing. Cheshire also maintains that he did not deviate from protocol and that it was not pilot error alone that led to his termination. Instead, Cheshire contends that the decision to terminate him was based on his protected whistleblowing activity.

### B.    Cheshire's Whistleblowing Activity

During his employment with AMC, Cheshire informed his supervisors of multiple issues he considered to be violations of law.

1.      **Aircraft Safety-Related Violations**

Cheshire made many complaints concerning behavior and aircraft problems that he believed

violated FAA regulations.

a.      ***Interference with Flight Operations by Pafford Employee Keith Carter ("Carter")***

Cheshire reported to supervisors Dennis Smith ("Smith") and Worthington that Carter,

director of operations for Pafford, was not "qualified to function in the operations chain," and that

allowing him to do so "was definitely against FAA regulations." [Doc. No. 131-1, Cheshire Depo.

p. 85]. Cheshire further reported that Carter put pressure on the crew to fly and complete missions.

According to Cheshire, this pressure had a detrimental effect on the crew.

b.      ***Safety Violations by Pafford Employee Michael Keener ("Keener")***

Cheshire notified his superiors that Keener walked in and out of the rotor arc while the

aircraft was starting up or shutting down, did not wear night vision goggles, slept in the aircraft, did

not watch out for objects that could hit the aircraft, and vomited in the aircraft. *Id*. at 87-89. Cheshire

also claims that Keener was suspected of tampering with the flight medications. Cheshire reported

to Smith and Worthington that there were patients on his aircraft "who were not responding to

medications the way they were supposed to" which allowed for the possibility of "a patient flailing

about so much that they could unsettle the stability of the aircraft and compromise flight safety." *Id.*

at 53-54.

c.      ***Fixed Wing Platform, Faulty TOT Light, Failure to Include Maintenance Information in the Maintenance Records, and Other Issues Related to the Aircraft***

Cheshire alerted Smith and Worthington to what he considered to be problems with AMC's

4

fixed wing program.[3] *Id.* at 67-70. He also alerted them to a faulty TOT light onboard the aircraft, as well as a failure on the part of the maintenance crew to include corrosion information in the records in connection with the January 3, 2014 precautionary landing. *Id.* at 188, 189. Finally, Cheshire told his direct supervisor at the time, Charles Brady ("Brady"), that there were issues with fuel, fuel gauges, fuel sensors, and inaccurate readings from the aircraft. [Doc. No. 135-4, Brady Depo. p. 9].

### 2.    Violations Related to Controlled Substances

Cheshire reported to Smith and Worthington that Pafford fired Keener for stealing, redirecting, and/or tampering with in-flight medications. [Doc. No. 131-1, Cheshire Depo., p. 46, 47].

### 3.    Insurance/Medicaid Fraud

Cheshire told Worthington and Smith that he believed Pafford was submitting fraudulent insurance claims tied to Keener's redirecting of medications. *Id.* at 51-52. Specifically, it appears that Cheshire believed that Pafford was submitting false claims based on medications that were not given to patients.

### 4.    Theft

Cheshire claims that he discovered a co-worker was stealing flight helmets. He alerted Smith and Worthington of the thefts in 2013.

---

[3]When an AMC pilot was flying close to his duty time limit, Pafford would allow the pilot to fly as a passenger on its fixed-wing aircraft to return to the Ruston base. Cheshire reported a number of problems with the program which he believed were violations of FAA regulations that had been adopted by the Louisiana Department of Transportation and Development.

### C.    The Current Action

Claiming that AMC terminated him for his whistleblowing and not his deviation from protocol, Cheshire initially brought suit in state court.  On March 27, 2015, the action was removed to this Court. [Doc. No. 1]. On March 11, 2016, after numerous discovery disputes, the parties filed cross motions for summary judgment. [Doc. Nos. 130, 131].

On April 4, 2016, Cheshire filed a memorandum in opposition to AMC's Motion for Summary Judgment. [Doc. No. 135]. That same day, AMC filed a memorandum in opposition to Cheshire's Motion for Summary Judgment [Doc. No. 137], as well as a Motion to Strike Cheshire's affidavit in support of his motion for summary judgment. [Doc. No. 136]. Cheshire has not filed an opposition to the Motion to Strike. AMC filed a reply to Cheshire's memorandum in opposition to AMC's Motion for Summary Judgment on April 18, 2016. [Doc. No. 141]. These motions are ripe.

## II.    LAW AND ANALYSIS

### A.    Motion to Strike Cheshire's Affidavit [Doc. No. 136].

AMC filed a motion to strike Cheshire's affidavit, arguing that it contains inappropriate conclusions of law and fact and statements not made on personal knowledge. Cheshire did not file any opposition to the motion.

Because Cheshire did not file an opposition, under Local Rule 7.5, the Motion to Strike is deemed unopposed. Nevertheless, the Court must consider the substance of the motion. The court finds, on review, that the motion has merit. Cheshire's affidavit is rife with legal conclusions and conclusory factual assertions with no indication of personal knowledge. *See Clark v. Am's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat

a motion for summary judgment.").

Because it is unopposed and meritorious, the Motion to Strike is GRANTED. The Court will not consider Cheshire's affidavit [Doc. No. 130-17] in addressing the cross motions for summary judgment.

### B.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory

allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

In a bench trial, "a district court has somewhat greater discretion to consider what weight it will accord the evidence." *In re Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir.1991).  A court "has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Id.* at 398 (citing *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir.1978)).

### C.    The LWS

The LWS provides in pertinent part:

> A.    An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
>
> > (1)    Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
> >
> > (2)    Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
> >
> > (3)    Objects to or refuses to participate in an employment act or practice that is in violation of law.

LA. REV. STAT. § 23:967(A).

The LWS defines reprisal to include "firing, layoff, loss of benefits, or any other discriminatory action the court finds was taken as a result of an action by the employee that is protected by Subsection A of this Section..."*Id.* § 23:967(C)(1).

Louisiana courts look to federal anti-discrimination jurisprudence for guidance when interpreting the LWS. *See Sprull v. City of Baton Rouge*, 09-689, 2012 WL 2426793 at *2 (M.D. La.

June 26, 2012). Accordingly, the *McDonnell Douglas* burden-shifting framework is used to evaluate the evidence. *See Kirmer v. Goodyear Tire & Rubber Co.*, 538 Fed. App'x 520, 527 (5th Cir. 2013).Under that framework, Cheshire must first establish a *prima facie* case.

"In order for a plaintiff to establish a *prima facie* case of retaliation under [the LWS], he must show (1) that he engaged in activity protected by the statute; (2) he suffered an adverse employment action; and (3) a causal connection existed between the activity in which he engaged and the adverse action." *Bain v. Ga. Gulf Corp.*, 462 Fed.App'x 431, 433 (5th Cir. 2012) (citations omitted).

The case law interpreting the LWS has developed important parameters for the statute's application. First, the Louisiana Supreme Court has recently endorsed the position uniformly adopted by the Louisiana appellate courts: only violations of **state** law–not federal law–can support a cause of action under the LWS. *See Encalarde v. New Orleans Ctr. for Creative Arts/Riverfront*, 2014-2430 (La. 2/13/15); 158 So.2d 826-27; *see also Accardo v. La. Health Servs. & Indem. Co.*, 2005-2377 (La. App. 1 Cir. 6/21/06); 943 So.2d 381, 387; *Barber v. Marine Drilling Mgmt., Inc.*, No. 01-1986, 2002 WL 237848 at *10 (E.D. La. Feb. 15, 2002); *Wilson v. Tregre*, 787 F.3d 322, 326 (5th Cir. 2015); *Wells v. City of Alexandria*, No. 03-30750, 2004 WL 909735 at *1 (5th Cir. Apr. 29, 2004).

Second, the Fifth Circuit, interpreting the LWS, has found that the plaintiff must point to a **specific** provision of state law which the employer violated. *See Ware v. CLECO Power LLC*, 90 Fed. App'x. 705 (5th Cir. 2004); *Genella v. Renaissance Media*, 115 Fed.App'x. 650 (5th Cir. 2004).

Third, according to all Louisiana appellate courts that have considered the issue, the employer must **actually** violate state law. *See, e.g., Accardo* 943 So.2d at 383; *Hale*, 886 So.2d at

9

1210, *writ denied*, 896 So.2d 1036 (La. 3/24/05); *Goldsby v. State Dep't of Corr.*, 861 So.2d 236 (La. App. 1 Cir/ 11/7/03), *writ denied*, 0328 870 So.2d 271 (La. 4/8/04), and *writ denied*, 870 So.2d 271 (La. 4/8/04). Thus, the employee's good faith belief, which later turns out to be erroneous, that an employer violated the law does not give rise to a viable cause of action under the LWS. *Mabry v. Andrus*, 45, 135 (La. App. 2 Cir. 4/14/10); 34 So.3d 1075, 1081; *Ganheart v. Xavier univ.*, No. 07-9703, 2009 WL 24227 at *9 (E.D. La. Jan. 2, 2009).

Fourth, although it does not appear that the Louisiana Supreme Court has addressed the issue, Louisiana appellate courts and federal courts agree that the ***employer***, not a mere co-worker or third party, must violate state law. *See Fondren v. Greater New Orleans Expressway Comm'n*, 871 So.2d 688, 691 (La. App. 5 Cir. 4/27/04) (citing *Puig v. Greater New Orleans Expressway Commission*, 772 So.2d 842, 845 (La. App. 5 Cir. 10/31/00), *writ denied*, 786 So.2d 731 (La. 3/9/01)); *see also Goulas v. LaGreca*, 945 F.Supp.2d 693, 703 (E.D. La. 2013) (holding that employee who advised that co-worker was using drugs on premises did not have an LWS claim) *aff'd sub nom. Goulas v. LaGreca Serv. Inc.*, 13-30651, 2014 WL 718433 (5th Cir. Feb. 26, 2014).

Finally, Louisiana appellate courts and federal courts that have considered the issue agree that the employee must have ***knowledge*** of the state law violation at the time he advises the employer of it. *Crowe v. Southeast Comm. Health Sys.*, 10-2838, 2014 WL 1456352 at *6 (E.D. La. Apr. 14, 2014) (citing *Hale*, 886 So.2d at 1215).

If Cheshire establishes a *prima facie* case of retaliation under the LWS, the burden shifts to AMC to produce a legitimate, nonretaliatory reason for its actions. If AMC produces such a reason, the burden shifts back to Cheshire to establish that AMC's legitimate reasons for the adverse employment action are pretext for a retaliatory motive.

10

Applying those principles, Cheshire fails to establish a *prima facie* case.[4]

### 1.      Cheshire's *Prima Facie* Case

The Court organizes the analysis of Cheshire's *prima facie* case according to the law AMC allegedly violated.

#### a.      *Aircraft Safety-Related Violations*

Cheshire points the Court to AMC's alleged violations of law related to aircraft safety. In his deposition, Cheshire submitted that the complained-of activity violated FAA regulations. However, the LWS does not regulate employer violations of federal law, such as the regulations promulgated by the FAA. Seeking to dodge that point, Cheshire argues that the Louisiana Department of Transportation and Development incorporates the FAA regulations. He cites no case, statute, or regulation to support this theory, and the Court rejects it.

Rather, federal law preempts the "entire field of aviation safety to the exclusion of state law." *Goodspeed Airport v. East Haddam Inland Wetlands and Watercourses Com'n*, 681 F.Supp.2d 182, 200 (D. Conn. 2010); *see also Montalvo v. Spirit Airlines*, 508 F.3d 464, 469 (9th Cir. 2007) (holding that the FAA preempts the entire field of aviation safety from state and territorial regulation); *Witty v. Delta Airlines*, 366 F.3d 380, 384 (5th Cir. 2004) ("Pursuant to its congressional

---

[4]AMC argues that Cheshire reported the alleged violations as part of his employment duties, precluding a valid LWS claim. AMC cites a Louisiana appellate court decision in support. *See Matthews v. Military Dept. ex rel. State*, 2007-1337 (La. App. 1 Cir. 9/24/07); 970 So.2d 1089, 1090 (noting, without analysis, that the LWS and the Louisiana Environmental Whistleblower Statute do not apply to employees reporting illicit behavior as part of their normal job duty). Although the Court does not rely on this argument given the more obvious issues with Cheshire's claim, AMC makes a persuasive case that the LWS should not apply to employee complaints made as part of the employee's job responsibilities. This limitation would seem to bar Cheshire's claims because the record shows Cheshire had a responsibility to report any perceived violations of law.

charge to regulate air safety, the Federal Aviation Administration has issued a broad array of safety-related regulations codified in Title 14 of the Code of Federal Regulations. These regulations cover airworthiness standards, crew certification and medical standards, and aircraft operating requirements.").

The only specific Louisiana regulation Cheshire cites to support his argument with respect to aircraft safety-related violations comes from a regulation in the Louisiana Administrative Code which provides: "[a]n applicant seeking a license as an ambulance provider [] submit a completed application" to DHH with certain supporting documentation, which includes a valid FAA part 135 certificate." LA. ADMIN CODE tit. 48 § 6005(D)(3)(g).

Cheshire does not explain how AMC violated this regulation. Indeed, he provides no evidence how AMC's part 135 certificate departs from the FAA requirements. He appears to ask the Court to infer that, because his expert opines that some AMC procedures and aircraft deviated from FAA guidelines, AMC did not have a valid FAA part 135 certificate when it applied for its ambulance-provider license. However, there is no evidence of when AMC obtained the part 135 certificate, and whether, at the time of filing, there were problems with FAA regulations. *Cheshire* has the burden of proof on this issue, and there is simply no record evidence related to AMC's acquisition of a part 135 Flight Certificate. Because Cheshire does show a genuine issue of material fact concerning AMC's violation of a Louisiana law related to aircraft safety, those alleged violations cannot serve as the basis for his LWS claim.

12

**b.** **Violations of La. Rev. Stat., 40:961, et seq. ("Controlled Dangerous Substances Law")** [5]

Next, Cheshire claims that AMC conspired with Pafford to violate certain provisions of the Controlled Dangerous Substances Law. Specifically, Cheshire alleges Keener was stealing or redirecting medications during the flights. According to Cheshire, AMC was criminally liable for Pafford's employee's acts because it had a conspiracy with Pafford to conceal the illegal possession of these controlled substances.

This argument cannot defeat summary judgment. There is no evidence that AMC conspired with Pafford to violate the Controlled Dangerous Substances Law. Instead, Cheshire informed AMC that a *Pafford* employee was potentially possessing and diverting controlled substances. The LWS was designed to address employer misconduct. *See Broussard v. Lafayette City-Parish Consolidated Government*, 45 F.Supp.3d 553, 581 (W.D. La. 2014) ("The [LWS] targets serious *employer* misconduct that violates the law.") (emphasis added) (citations omitted). The violation of the Controlled Dangerous Substances Law by a Pafford employee cannot support Cheshire's LWS claim against AMC.

**c.** **Medicare, Medicaid, and Insurance Fraud**

Cheshire next claims that AMC perpetrated Medicaid, Medicare, and insurance fraud. However, the only specific law which Cheshire cites is LA. REV. STAT. 14:70.1 which deals with Medicaid fraud. The statute provides as follows:

---

[5]Cheshire points to two provisions of the Controlled Dangerous Substances Law specifically. First, Cheshire points to LA. REV. STAT. § 40:967(C) which prohibits possession of controlled dangerous substances except when obtained directly or pursuant to a valid prescription. Second, Cheshire points to LA. REV. STAT. § 40:968(C), a provision which prescribes the penalties for possessing controlled substances.

13

A.  The crime of medicaid fraud is the act of any person who, with intent to defraud the state or any person or entity through any medical assistance program created under the federal Social Security Act and administered by the Department of Health and Hospitals or any other state agency, does any of the following:

(1)  Presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise.

(2)  knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise.

(3)  knowingly submits false information for the purpose of obtaining authorization for furnishing services or merchandise.

LA. REV. STAT. § 14:70.1(A).

Cheshire advances two theories which he claims show that AMC engaged in fraud.

Cheshire claims that he told his superiors Pafford was engaged in fraud by submitting false insurance claims tied to Keener's conduct–the implication being that Pafford submitted claims for medication to insurers and Medicaid, even though Keener tampered with and/or stole the medication. However, Cheshire has no evidence showing Pafford engaged in such conduct; he points to no false claim that Pafford submitted, nor does he assert that he witnessed such activity. At the summary judgment stage, speculation cannot create a genuine issue of material fact for trial. *See Lawrence v. Federal Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015) (quoting *Likens v. Hartford Life & Accident Ins. Co.*, 688 F.3d 197, 202 (5th Cir. 2012)).

Even assuming, *arguendo*, that **Pafford** engaged in some type of fraud, it is unclear how **AMC** did. Cheshire claims that after he was fired, he saw a contract between AMC and Pafford that obligated AMC to be aware of Pafford's alleged misconduct.

Q.  What information do you have that would support that [AMC] was

14

committing fraud? What evidence?

A.      Now or then?

Q.      Then. At the time.

A.      [AMC] had a contract with Pafford. ***We were not privy to that contract. But it's my understanding that the contract allows or requires [AMC] to be aware of the medical support provided the patient***. So I can tell that when you do–if you were to do a statistical analysis on your patients and the medications they're getting and you're billing, you would see that something is anomalous. ***I believe [AMC] could have seen that.***

[Doc. No. 131-1, Cheshire Depo., p. 52] (emphasis added).

First, Cheshire's testimony as to what he believes a contract provides does not allow a "rational, non-speculative finding" that AMC deviated from the contract. *See Ruiz v. Whirlpool, Inc.*, 12 F.3d 510, 514 (5th Cir. 1994) (refusing to credit summary judgment testimony which was speculative). Similarly, Cheshire's testimony as to what he "believe[s]" AMC could have discovered from a statistical analysis is unfounded speculation. Thus, there is no non-speculative evidence in the record that AMC breached the contract.

Even if the Court were to credit Cheshire's testimony, at the absolute most, this evidence tends to show AMC may have breached its contract with Pafford by lacking awareness of the medical support Pafford was providing. There is no evidence that AMC committed Medicaid fraud, or any other type of fraud for that matter, by submitting a false claim with the intent to deceive. Indeed, Cheshire's fraud by contract theory is premised on a dereliction of duty, not an intent to deceive. *See Smith v. Roussel*, 2000-1028, (La. App. 1 Cir. 6/22/01); 809 So.2d 159, 164 ("Fraud, however, cannot be predicated on mere mistake or negligence, however gross, and it is generally held that fraudulent intent, intent to deceive, or equivalent thereof is an essential element of fraud.")

15

(citing *Bass v. Coupel*, 93-1270, p. 5 (La. App. 1 Cir. 6/23/95); 671 So.2d 344, 347).

As an alternative theory for finding Medicaid fraud, Cheshire claims that one of AMC's mechanics installed an unapproved part of the aircraft, which resulted in "every flight billed to insurance and Medicaid" thereafter being fraudulent. Cheshire cites no law in support of this theory, and it has no merit for multiple reasons. There is no evidence to suggest Cheshire advised AMC of fraud related to an unapproved aircraft part. The LWS requires a successful plaintiff to first advise his employer of a violation of the law.  LA. REV. STAT. § 23:967(A). Moreover, the Louisiana Medicaid fraud statute requires some evidence that AMC was involved in intentionally submitting false claims or information. Cheshire cites no evidence that AMC submitted any claims or information whatsoever, much less that it submitted claims or information with the specific intent to defraud. Nor is there any evidence that AMC, with fraudulent intent, collaborated with Pafford to submit false claims or information. Thus, fraud cannot serve as the basis for Cheshire's LWS claim.

### d.    Theft

Cheshire claims that he reported to Worthington and Smith that a co-worker was stealing flight helmets. Although theft is certainly a violation of state law, the LWS applies only to employer violations of state law–not the unauthorized acts of employees. *See Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015); *Dillon v. Lakeview Reg. Med. Ctr. Auxilliary, Inc*., 2011-1878 (La. App. 1 Cir. 6/13/12); 2012 WL 2154346, at *5 & n.8, *writ denied*, 2012-1618 (La. 10/26/12), 99 So.3d 651 (observing that "it could be concluded that the employer must be the actor who violated the law, in order for there to be a cause of action under" § 23:967, and that "there is no indication" that the statute "would encompass unauthorized acts of...employees").

16

e.       *Improper Filings to the FAA and the United States Department of Treasury ("Dept of Treasury")*

In his motion for summary judgment, Cheshire alleges for the first time that AMC made false filings to the FAA and the Department of Treasury regarding one of Pafford's aircraft, which, according to Cheshire, was not authorized to transport AMC employees. This allegation cannot support a LWS claim because there is no evidence in the record that Cheshire reported this alleged activity to anyone at AMC. Under the LWS, liability attaches only if the employee first advises the employer of the violation of law. LA. REV. STAT. § 23:967(A).

In sum, with respect to all of Cheshire's alleged whistleblowing activity, he either failed to assert a violation of state law, the violation was not reported to AMC, the law was not actually violated, or the violation was committed by a co-worker or third party. Hence, summary judgment is appropriate on Cheshire's LWS claim. However, for the sake of thoroughness, the Court will complete the burden-shifting analysis below.

### 2.       Legitimate Reasons for the Termination

Assuming Cheshire could establish a *prima facie* case under the LWS statute, the burden shifts to AMC to produce a legitimate reason for the termination. *See Stallworth v. Singing River Health Sys.*, 469 Fed. App'x 369, 371-72 (5th Cir. 2012) (citing *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010); *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 399, 401-02 (5th Cir. 2000)). This is a minimal burden that AMC easily meets.

Specifically, AMC points to a series of incidents in which Cheshire allegedly violated safety mandates, jeopardizing his life as well as others and culminating in his termination:

- On December 23, 2013, Cheshire noticed the TOT light illuminated when he started his aircraft, but did not report the incident through an AIDMOR as required by AMC

17

policy.

- After Cheshire made a precautionary landing on January 3, 2014, AMC determined that the generator fail light had burned out and Cheshire failed to follow his checklist which would have identified the issue.

- On January 21, 2014, Cheshire flew from LSU hospital in downtown Shreveport to an airfield in Minden with low fuel, in violation of FAA and AMC standards.

- AMC also learned that Cheshire suspected a problem with the fuel indicating system before the January 21, 2014 incident, but did not report it until after the incident.

### 3.    Pretext

The burden of proof shifts to Cheshire to establish that AMC's reasons are pretextual. Cheshire fails in this regard. Cheshire's briefing is difficult to follow, but the Court has compiled the following arguments that Cheshire makes in support of pretext.

First, Cheshire cites an inter-office email between Angela Tinsley ("Tinsley"), Worthington, and Tish.  He claims that in the email, Tinsley seeks documentation to support termination of Cheshire. The email states as follows:

Tinsley:     Do we have any previous performance write-ups on him? If so, can you send them to me? I will reach out to Scott to see what he wants to do with him but it sounds like the customer wants him out.

[Doc. No. 135-3, p. 2].

The argument is unpersuasive. The email string also contains an email from Tish explicitly stating that "this pertains primarily with the low fuel issue." *Id*. Indeed, nothing in the email chain suggests that Cheshire's whistleblowing had any bearing on AMC's intent to terminate him.

Cheshire next attacks the credibility of an eyewitness who divulged information to AMC during its investigation into Cheshire's malfeasance. Cheshire had reported this eyewitness for unrelated violations months before AMC decided to terminate Cheshire. The argument is unavailing.

18

Faulty investigations do not necessarily demonstrate pretext. *See, e.g., Hinga v. MIC Group LLC*, 13-0414, 2014 WL 4273887 at *3 (S.D. Tex. Aug. 29, 2014) ("Importantly, in the case of an allegedly flawed investigation, a plaintiff must do more than show defendant's mistaken belief regarding the investigation's conclusions to survive summary judgment–plaintiff must show that defendant's belief was dishonest and masked a [retaliatory] purpose.") (citing *Swenson v. Schwan's Consumer Brands N. Am., Inc.*, 500 Fed. App'x. 343, 346 (5th Cir. 2012); *Waggoner v. City of Garland, Tex*., 987 F.2d 1160, 1166 (5th Cir. 1993)); *see also Kariotis v. Navistart Intern. Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (rejecting argument that faulty investigation demonstrated pretext because the question is not whether the employer's justification is correct, but whether it is honest). Rather, the question is whether the employer's explanation is honestly believed. *See Culver v. Gorman*, 416 F.3d 540 (7th Cir. 2005) ("[a]n employer's explanation can be 'foolish or trivial or even baseless' so long as it 'honestly believed' the proffered reasons for the adverse employment action.") (citation omitted). Here, Cheshire cites no evidence to suggest AMC did not honestly believe that Cheshire deviated from protocol.

Cheshire next argues that the fuel system on the aircraft was in "dire need of calibration or maintenance." First, Cheshire cites no record evidence in support of that assertion. Second, Cheshire makes no attempt to explain the relevance of this assertion. Even assuming it was true, it is unclear how it would show pretext.

Next, Cheshire argues that another employee, Brady, testified that he had "low fuel light illumination and hot starts but was not reprimanded or terminated." [Doc. No. 135, Cheshire Memo in Opposition, p. 3]. This bare assertion, without more, cannot demonstrate pretext. For one thing, AMC did not have a policy prohibiting hot starts. AMC took issue with employees who failed to

19

*report* hot starts. There is no evidence that Brady failed to report the hot start.[6]

Next, Cheshire maintains that, according to expert David Downey ("Downey"), "the reports were misleading to the point of being fraudulent." [Doc. No. 135, Cheshire Memo in Opposition, p. 3]. Cheshire cites Downey's entire expert report in support of that assertion. It is unclear what "reports" Downey relies on for this opinion. Moreover, Cheshire does not explain how these reports would have any impact on the pretext analysis. Cheshire does not allege AMC relied on these reports in deciding to terminate Cheshire.

Next, Cheshire appears to make more arguments in support of finding pretext which revolve around whether there was actually pilot error in relation to the incidents. He supports the arguments by opining that the aircraft was not airworthy. He also continually points to the nineteen-page expert report of Downey and the entire deposition of Brady–with few citations to any specific portions of those documents and with no explanation of how those documents support his position.[7] However, the expert report says nothing about what AMC knew when it decided to fire Cheshire, or whether it believed Cheshire deviated from protocol. Again, Cheshire must point to some genuine issue of material fact that AMC did not have an honest belief Cheshire deviated from protocol. He fails in that endeavor.

---

[6]Even if there was such evidence, it could not defeat summary judgment unless Cheshire could show that he was similarly situated to Brady. Employees with similar disciplinary records, supervisors, and responsibilities are similarly situated. *Coleman v. Zexxon Chemical Corp.*, 162 F.Supp.2d 593, 608 (S.D. Tex. 2001) (citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514-15 (5th Cir. 2001). Cheshire cites no evidence as to Brady's disciplinary record, supervisor, or responsibilities.

[7]Essentially, Downey opines that many practices of AMC, as well as many characteristics of its aircraft, did not comply with FAA regulations. That opinion is irrelevant under the LWS which is concerned only with violations of state law. *See Corley v. La. ex rel. Div. of Admin., Office of Risk Management*, 498 Fed. App'x 448, 451 (5th Cir. 2012).

Next, Cheshire argues that AMC did not conduct an investigation at all. In support, he again cites the entire Brady deposition and the entire Downey report. But Downey's expert report contains no mention of the investigation or lack thereof and does not show pretext. Moreover, the Court can find nothing in Brady's deposition which supports Cheshire's assertion. On the contrary, AMC has produced an extremely detailed record of the investigation.

Finally, Cheshire attempts to show pretext through touting his excellence as a pilot. He notes that he has never received a failing score on a "check ride," reminds the Court that Brady testified that he would allow his family to ride on a plane piloted by Cheshire, and asserts that Brady gave him a glowing letter of recommendation to potential employers after he left AMC.

However, Cheshire's test results and praise from his direct supervisor do not establish pretext. The question is not whether AMC made a wise decision; the question is whether the decision was driven by a retaliatory motive. *See E.E.O.C. v. Omni Hotels Mang. Corp.*, 516 F.Supp.2d 678, 708 (N.D. Tex. 2007) (citing *Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 476 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-[retaliatory] ones."). Cheshire has not cited any evidence sufficient to find a genuine issue of material fact on pretext.[8] Accordingly, AMC's Motion for Summary Judgment is GRANTED, and Cheshire's claim is DISMISSED WITH PREJUDICE. Cheshire's Motion for Summary Judgment is DENIED.

## III.   CONCLUSION

---

[8]Worthington supplied a multi-page declaration complete with exhibits which capture his efforts to investigate the incident, as well as the results of the investigation. The exhibits include emails between him and Smith, the other decision maker, clearly documenting their belief that Cheshire had been involved in multiple incidents. [Doc. No. 131-8, Worthington Declaration, Exhibit A]. Cheshire cites no competent summary judgment evidence to the contrary.

For the foregoing reasons, AMC's motion to strike Cheshire's Affidavit [Doc. No. 136] is GRANTED. AMC's Motion for Summary Judgment is GRANTED [Doc. No. 131], and Cheshire's claim is DISMISSED WITH PREJUDICE. Cheshire's Motion for Summary Judgment [Doc. No. 130] is DENIED.

MONROE, LOUISIANA, this 25th day of May, 2016.


_____
**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**

22